1
 2024 CO 63
In Re the Application for Water Rights of Lazy D Grazing Association in Weld County. Opposers-Appellants City of Sterling and City of Fort Collins, v. Lazy D Grazing Association, Applicant-Appellee and Basin Lands, LLC; Bijou Irrigation Company; Bijou Irrigation District; Cache La Poudre Water Users Association; City of Boulder; City of Englewood; City of Greeley, acting by and through its Water and Sewer Board; City of Thornton; L.G. Everist, Inc.; Northern Colorado Water Conservancy District; Mary Estabrook; State Engineer and Division Engineer for Water Division No. 1; and United Water and Sanitation District. Opposers-Appellees No. 23SA258
Supreme Court of Colorado, En Banc
September 30, 2024

 Appeal
 from the District Court District Court, Water Division 1,
 Case No. 20CW3113 Honorable Todd Taylor, Water Judge

 Attorneys for Opposer-Appellant City of Sterling: Curtis,
 Justus, & Zahedi, LLC Alan E. Curtis Nicoli R. Bowley
 Westminster, Colorado

 Attorneys for Opposer-Appellant City of Fort Collins: Fort
 Collins City Attorney's Office Eric R. Potyondy Fort
 Collins, Colorado

 Attorneys for Applicant-Appellee: Lawrence Custer Grasmick
 Jones & Donovan, LLP Bradley C. Grasmick Wesley S. Knoll
Richard LiPuma Johnstown, Colorado

 No
 appearance on behalf of: Basin Lands, LLC; Bijou Irrigation
 Company; Bijou Irrigation District; Cache La Poudre Water
 Users Association; City of Boulder; City of Englewood; City
 of Greeley, acting by and through its Water and Sewer Board;
 City of Thornton; L.G. Everist, Inc.; Northern Colorado Water
 Conservancy District; Mary Estabrook; State Engineer and
 Division Engineer for Water Division No. 1; and United Water
 and Sanitation District.

 JUSTICE HOOD delivered the Opinion of the Court, in which
 CHIEF JUSTICE MÁRQUEZ, JUSTICE BOATRIGHT, JUSTICE
 GABRIEL, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE
 BERKENKOTTER joined.

 OPINION

 HOOD
 JUSTICE

 ¶1
 In this appeal, we address whether a large ranch in northern
 Colorado has the right to use a vast deposit of a rare and
 valuable commodity in our increasingly arid state:
 groundwater. The water court sitting in Greeley determined
 that groundwater under the property managed by the Lazy D
 Grazing Association ("Lazy D") is nontributary;
 meaning, the water is not subject to the prior appropriation
 system and that Lazy D, as the overlying landowner, is
 entitled to use it.

 ¶2
 The City of Sterling and the City of Fort Collins
(collectively, "the Cities") opposed and now appeal
 that decision. They assert that (1) the State Engineer
 exceeded his authority in determining that the groundwater in
 question was nontributary and (2) the water court improperly
 presumed the truth of the State Engineer's findings,
 relied on sources not in evidence, and discredited expert
 evidence without justification.

 ¶3
We disagree with the Cities. In a thorough order, the water
 court largely got the law right, and the few errors it made
 were harmless. We therefore affirm the water court's
 decision that Lazy D is authorized to withdraw and use the
 nontributary groundwater from the Upper Laramie Aquifer
 underlying the ranch it manages.

 I.
Facts and Procedural History

 ¶4
 Lazy D manages a nearly 25,000-acre ranch along the
 Colorado-Wyoming border ("the Ranch"). The Ranch
 has very little access to surface water for irrigation; it
 contains only seasonal streams. So in 2020, Lazy D sought a
 determination from the water court that the groundwater
 underlying the Ranch in the Upper Laramie Aquifer is
 nontributary as defined in section 37-90-103(10.5), C.R.S.
(2024) (defining "[n]ontributary groundwater" as
 "groundwater, located outside the boundaries of any
 designated groundwater basins in existence on January 1,
 1985, the withdrawal of which will not, within one hundred
 years of continuous withdrawal, deplete the flow of a natural
 stream . . . at an annual rate greater than one-tenth of one
 percent of the annual rate of withdrawal").

 ¶5
 This requested designation prompted the interest of many
 other Colorado water users because nontributary groundwater
 isn't subject to Colorado's prior appropriation
 system, § 37-92-103(3)(a), C.R.S. (2024), and the party
 who owns the surface property over the water completely
 controls its use, § 37-90-137(4)(b)(II), C.R.S. (2024).
Fearing that a nontributary designation would injure their
 existing water rights in the over-appropriated South Platte
 and Cache la Poudre River Basins, see City of Thornton v.
 Bijou Irrigation Co., 926 P.2d 1, 71 n.66 (Colo. 1996),
 various individuals, municipalities, and nonprofit
 organizations opposed

 Lazy D's application. Lazy D resolved its issues with all
 the opposers except the Cities, and the case moved to trial
 with only the Cities as opposers.

 ¶6
 Before trial, the State Engineer published his determination
 of facts regarding the groundwater underlying the Ranch
 pursuant to section 37-92-302(2)(a), C.R.S. (2024). In
 relevant part, the State Engineer found that the Upper
 Laramie Aquifer beneath the Ranch is "predominantly
 confined"[1] (and therefore physically separated from
 the surface water) except along the southern edges of the
 property. In these unconfined portions, the aquifer sits
 beneath one permanent stream-Lone Tree Creek-and several
 intermittent streams. The State Engineer found that the
 aquifer is physically separated from Lone Tree Creek, as it
 sits significantly below the alluvium[2] of all intermittent streams.
The State Engineer then found that

[w]ithdrawal of groundwater from the Upper Laramie [A]quifer
 underlying the land claimed in the application will not,
 within one hundred years of continuous withdrawal, deplete
 the flow of a natural stream at an annual rate greater than
 one-tenth of one percent of the annual rate of withdrawal and
 therefore the groundwater is nontributary . . . .

 ¶7
 During the trial, dueling experts testified. Lazy D's
 expert, Walter Niccoli, opined that the Upper Laramie Aquifer
 was completely hydraulically disconnected from surface
 streams, so withdrawal from the aquifer would have no effect
 on natural stream flow. The Cities' expert, Timothy
 Crawford, countered with his conclusion that a hydraulic
 connection did exist at points.

 ¶8
 In its findings of fact, the water court acknowledged that
 the State engineer's determinations were entitled to a
 presumption of truth under section 37-92-305(6)(b), C.R.S.
(2024), which the Cities failed to rebut. The water court
 then found "by clear and convincing [evidence] that the
 groundwater in the Upper Laramie Aquifer is physically and
 hydraulically separated from the water in the overlying
 surface stream systems and their alluvium." And it
 determined as a matter of law that "Lazy D is . . .
 entitled to a decree for all nontributary

 groundwater within the Upper Laramie Aquifer underlying its
 property." The Cities appealed.[3]

 II.
Analysis

 ¶9
 The Cities raise four primary challenges to the water
 court's order. After briefly detailing the relevant
 standards of review and our interpretive principles, we
 address each challenge in turn.

 A.
Standards of Review and Principles of Statutory
 Interpretation

 ¶10
"[W]e review questions of water law and 'the water
 court's legal conclusions de novo.'" Wolfe
 v. Jim Hutton Educ. Found., 2015 CO 17, ¶ 9, 344
 P.3d 855, 859 (quoting City of Englewood v. Burlington
 Ditch, Reservoir & Land Co., 235 P.3d 1061, 1066
(Colo. 2010)). This includes questions of statutory
 interpretation. See Antero Treatment LLC v. Veolia Water
 Techs., Inc., 2023 CO 59, ¶ 11, 546 P.3d 1140,
 1145. In interpreting statutes, "[o]ur primary duty . .
 . is to give effect to the intent of the General Assembly,
 looking first to the statute's plain language."
Id. (quoting Vigil v. Franklin, 103 P.3d
 322, 327 (Colo. 2004)). In doing so, "we look to the
 entire statutory scheme in order to give consistent,
 harmonious, and sensible effect to all of its parts."
Chirinos-Raudales v. People, 2023 CO 33, ¶ 13,
 532 P.3d 1200, 1203 (quoting Bill Barrett Corp. v.
 Lembke, 2020 CO 73, ¶ 14, 474 P.3d 46, 49).

 ¶11
"[T]he water court's resolution of the factual
 issues presented will not be disturbed on appeal unless the
 evidence is wholly insufficient to support the
 decision." City & Cnty. of Denver ex rel. Bd. of
 Water Comm'rs v. Middle Park Water Conservancy
 Dist., 925 P.2d 283, 286 (Colo. 1996).

 B.
The State Engineer's Authority to Determine That
 Groundwater is Nontributary

 ¶12
 The Cities first contend that the State Engineer lacked the
 authority to determine that the groundwater in question was
 nontributary and, therefore, that the water court improperly
 gave this determination a presumption of truthfulness. While
 we agree that the water court erred, we see no basis for
 reversal.

 ¶13
 As to the water at issue here, the "water judge shall
 consider the state engineer's determination as to such
 groundwater as described in section 37-92-302(2) in lieu of
 findings made pursuant to section 37-90-137" and then
 give those findings of fact a rebuttable presumption of
 truth. § 37-92-305(6)(b). Subsection 302(2)(a) is broad:
 It provides that for such groundwater, the State Engineer
 shall make "a determination as to the facts of such
 application," but it doesn't specify which facts the
 State Engineer may (or may not) determine. §
 37-92-302(2)(a).

 ¶14
 The Cities argue that subsection 305(6)(b)'s reference to
 findings in lieu of those made pursuant to section 37-90-137
 imposes a limitation on subsection 302's broad mandate.
They suggest that only those facts that the State Engineer is
 entitled to find under section 37-90-137-namely, whether
 there is unappropriated water available, whether the proposed
 well would materially injure the vested water rights of
 others, and whether the proposed well is within 600 feet from
 an existing well-are entitled to the presumption of
 truthfulness. § 37-90-137(2)(b)(I).

 ¶15
 But reading subsection 305(6)(b) within its larger context
 belies this interpretation. As relevant here, subsection
 305(6)(a) provides that for determinations of water rights in
 tributary groundwater, "the water judge . . .
 shall consider the findings of the state engineer, made
 pursuant to section 37-90-137, which granted or denied
 the well permit and the consultation report of the
 state engineer or division engineer submitted pursuant to
 section 37-92-302(2)(a)." § 37-92-305(6)(a)
(emphases added). The reference in subsection 305(6)(b) to
 findings in lieu of those made under section
 37-90-137, when read against the reference in subsection
 305(6)(a) to findings made pursuant to section
 37-90-137, distinguishes the scope of the water judge's
 obligation to apply the presumption of truth based on the
 location of the water in question.[4] It doesn't curtail the
 State

 Engineer's
 authority to make findings (or the water judge's
 obligation to presume their truth) under subsection 302. The
 State Engineer is thus well within his right to determine the
 facts regarding whether groundwater is nontributary.

 ¶16
 What the State Engineer can't do when an applicant files
 a petition for a determination of water rights with the water
 court, though, is make the final determination that
 groundwater is or isn't nontributary. In this instance,
 the State Engineer is authorized to issue only a
 "determination as to the facts" of an
 application for nontributary water rights, §
 37-92-302(2)(a) (emphasis added), and the water court need
 give a presumption of truth only to "the state
 engineer's findings of fact contained within
 such determination," § 37-92-305(6)(b) (emphasis
 added). But whether "water underlying a particular
 parcel of land is nontributary . . . is a mixed question of
 fact and law," with the "characteristics of the
 aquifer" constituting facts and their application
 "to the legal standards of the Groundwater Management
 Act" constituting law. Chatfield E. Well Co. v.
 Chatfield E. Prop. Owners Ass'n, 956 P.2d 1260,
 1271-72 (Colo. 1998).

 ¶17
 Here, in addition to finding facts regarding the
 characteristics of the Upper Laramie Aquifer, the State
 Engineer found that "the groundwater is nontributary

 as defined in section 37-90-103(10.5)"-a legal
 conclusion. And the water court gave this legal conclusion a
 presumption of truth when it uniformly applied the
 presumption to the entirety of the State Engineer's
 determinations. This was error. But this error was ultimately
 harmless because the water court went on to conclude that the
 groundwater underlying the Ranch was nontributary "even
 in the absence of this presumption." See C.A.R.
 35(c) ("The appellate court may disregard any error or
 defect not affecting the substantial rights of the
 parties.").

 C.
Burden of Proof for Demonstrating the Groundwater at Issue is
 Tributary

 ¶18
 Next, the Cities argue that in applying section
 37-92-305(6)(b)'s presumption of truthfulness, the water
 court improperly shifted the burden of proof and required the
 Cities to prove that the groundwater underlying the Ranch was
 tributary.

 ¶19
"All ground water in Colorado . . . is presumed to be
 tributary absent clear and convincing evidence to the
 contrary." Colo. Ground Water Comm'n v. N.
 Kiowa-Bijou Groundwater Mgmt. Dist., 77 P.3d 62, 70
(Colo. 2003). Lazy D, as the party asserting that the
 groundwater beneath its Ranch is nontributary, from start to
 finish had the burden of persuasion before the water court.
See Stonewall Ests. v. CF&I Steel Corp., 592
 P.2d 1318, 1320 (Colo. 1979) (relying on Safranek v. Town
 of Limon, 228 P.2d 975, 977 (Colo. 1951)). Section
 37-92-305(6)(b)'s presumption didn't change this.
See Bd. of Assessment Appeals v. Sampson, 105 P.3d
 198, 205 (Colo. 2005);

People v. Gallegos, 692 P.2d 1074, 1078 (Colo.
1984). That presumption regarding the truthfulness of the
 State Engineer's findings of fact in this context merely
 "imposes upon the party against whom it is directed the
 burden of going forward with evidence to rebut or meet the
 presumption." CRE 301; see also Schenck v. Minolta
 Off. Sys., Inc., 802 P.2d 1131, 1133 (Colo.App. 1990)
("[A] presumption 'disappears' . . . 'when
 direct and credible evidence supports a contrary
 conclusion.'" (quoting City & Cnty. of
 Denver v. DeLong, 545 P.2d 154, 157 (Colo. 1976))). If
 the opposing parties, here the Cities, rebut the factual
 presumption by providing direct and credible evidence
 supporting a contrary conclusion, the water court must then
 analyze both parties' evidence in evaluating whether the
 applicant has satisfied its burden of persuading the water
 court by clear and convincing evidence that the groundwater
 is nontributary.

 ¶20
 At trial, Crawford presented evidence that contradicted the
 facts found by the State Engineer. For example, Crawford
 testified that the static water level in several wells along
 Spring Creek, a permanent stream southwest of the Ranch, was
 higher than the base of the nearby alluvium, indicating a
 hydraulic connection between the Upper Laramie Aquifer and
 Spring Creek. This expert evidence directly and credibly
 rebutted the claim that the Upper Laramie Aquifer is
 completely hydraulically disconnected from the groundwater,
 so the Cities

 presented evidence sufficient to rebut the presumption.
See Schenck, 802 P.2d at 1133.

 ¶21
 The water court's statement that "opposers have not
 rebutted the presumption that the Engineer's findings of
 fact are true" was, therefore, erroneous. But the water
 court applied the presumption correctly in practice: The
 court treated the presumption as rebutted, assessed the
 credibility of both parties' evidence, and then concluded
 that Lazy D had satisfied its burden of persuasion that the
 groundwater was nontributary by clear and convincing
 evidence. Contrary to the Cities' argument, the water
 court never shifted the burden of persuasion to the Cities to
 prove that the groundwater was tributary. Accordingly, the
 water court's error here, too, was harmless.

 D.
The Water
Court's Reliance on
Personal Knowledge
and

 Information
 Not in Evidence

 ¶22
 The Cities insist that the water court improperly relied on
 scientific information that wasn't in evidence. We
 disagree.

 ¶23
 A court may not consider information outside of the record in
 reaching its ultimate conclusions, see, e.g.,
 Anderson v. Lett, 374 P.2d 355, 357 (Colo. 1962);
Prestige Homes, Inc. v. Legouffe, 658 P.2d 850,
 853-54 (Colo. 1983), unless such information is "not
 subject to reasonable dispute," CRE 201(b). In
 Prestige Homes, for example, we determined that the
 court of appeals acted improperly by using medical treatises
 not in evidence to conclude that "an electric shock
 caused by

 contact with a 220 volt power line can cause serious injury
 without leaving a visible burn mark" when the
 parties' experts disputed this fact. 658 P.2d at 853-54.

 ¶24
 But courts may, and often do, consider treatises and other
 secondary sources to understand the subject matter underlying
 complex cases. See, e.g., Colo. Ground Water
 Comm'n, 77 P.3d at 69 (referencing the Colorado
 Geological Survey's Ground Water Atlas's statistic
 that "[g]round water supplies approximately eighteen
 percent of our state's water needs" as background);
Upper Black Squirrel Creek Ground Water Mgmt. Dist. v.
 Goss, 993 P.2d 1177, 1182 n.5 (Colo. 2000)
(incorporating by reference a scientific paper that provided
 a detailed "explanation of the hydrological
 interrelationship between tributary ground water and surface
 water" into our background description of Colorado's
 water law governance).

 ¶25
 The Cities identify ten instances in which the water court
 allegedly improperly relied on sources not in evidence. These
 references can be divided into two categories. The first
 category includes references that define geological
 terms[5]

 and are examples of perfectly acceptable background citations
 akin to those in North Kiowa-Bijou and Upper
 Black Squirrel.

 ¶26
 The second category includes references to scientific
 documents that support Niccoli's (Lazy D's expert)
 interpretations (and therefore contradict the Cities'
 expert's interpretations) of scientific
 principles.[6] While at first glance the water
 court's use of these references may appear similar to the
 court of appeals' improper reliance on medical treatises
 in Prestige Homes, there is a key distinction. In
 Prestige Homes, the court of appeals took judicial
 notice of the treatises' scientific conclusions and
 relied on them as objectively true. 658 P.2d at 853. But the
 water court here didn't; it merely used the references as
 evidence of the weight of the scientific authority on the
 disputed facts. For example, in crediting Niccoli's
 opinion that withdrawals from the Upper Laramie Aquifer
 don't affect the aquifer's recharge rate, the water
 court explained that Niccoli's "explanation is
 consistent with other authority," and then quoted an
 article by Herman Bower and Thomas Maddock, III-Making
 Sense of the Interactions Between Groundwater and Streamflow:
 Lessons for Water Masters and Adjudicators, Rivers, Vol.
 6, No. 1, at 28

(1997)-as an example of other authorities. The
 external references therefore don't independently form
 the basis for the water court's ultimate holding that the
 groundwater at issue was nontributary; the evidence that
 Niccoli presented does. These external references are
 acceptable, and the water court didn't err by including
 them.

 E.
Expert Testimony Under CRE 702

 ¶27
 Finally, the Cities maintain that the water court violated
 CRE 702 by not making specific findings as to why
 Niccoli's testimony was more credible or reliable than
 Crawford's.

 ¶28
 To be admissible, expert testimony must be both relevant and
 reliable. Est. of Ford v. Eicher, 250 P.3d 262, 266
(Colo. 2011). Trial courts are vested with broad discretion
 to determine the admissibility of such evidence. Id.
We've held, however, that a trial court should make
 "specific findings" regarding the factors it
 considered in determining admissibility, including its CRE
 403 considerations. Id.; see also Bocian v.
 Owners Ins. Co., 2020 COA 98, ¶¶ 65-66, 482
 P.3d 502, 516 (explaining that admissibility of CRE 702
 evidence is based on the totality of the circumstances and
 consideration of a non-exhaustive list of factors). But once
 a court determines expert testimony is admissible, it is for
 the trier of fact to resolve any issues of credibility and to
 determine how much weight to accord the evidence. See,
 e.g., People v. Fasy, 829 P.2d 1314, 1318
(Colo. 1992); In re Marriage of

Bookout, 833 P.2d 800, 804 (Colo.App. 1991). And
 neither CRE 702 nor caselaw requires the trier of fact to
 explain its considerations in this regard. Moreover, the
 water court thoroughly explained why it found Niccoli's
 testimony more credible than Crawford's; including, for
 example, that Crawford's answers during cross-examination
 contradicted the opinions he provided on direct examination
 and actually supported Niccoli's opinions.

 ¶29
 Therefore, because neither party disputes the experts'
 qualifications or the admissibility of their testimony,
 there's no ground for reversal on that basis.

 III.
Conclusion

 ¶30
We affirm the water court's order and return this case to
 the water court for further proceedings consistent with this
 opinion.

---------

[1] A "confined aquifer" is an
 aquifer bound both above and below by impermeable material.
U.S. Geological Surv., What is the difference between a
 confined and an unconfined (water table) aquifer?,
 https://www.usgs.gov/faqs/what-difference-between-a-confined-and-unconfined-water-table-aquifer#:~:text=A%
 20confined%20aquifer%20is%20an,the%20top%20of%20the%20aquifer
 [https:// perma.cc/7YX3-NKTJ]. Conversely, an
 "unconfined aquifer" contains no upper impermeable
 layer, resulting in the aquifer's water table sitting at
 atmospheric pressure. Id.

[2] "Alluvium" is the
 "clay, silt, sand, gravel, or similar detrital material
 deposited by running water"-the subsurface material
 under a surface stream. Alluvium, Merriam-Webster
 Dictionary,
 https://www.merriam-webster.com/dictionary/ alluvium
 [https://perma.cc/V82Z-78ND]. Water flowing through
 a surface stream's alluvium is considered part of the
 surface stream. § 37-92-102(1)(b), C.R.S. (2024)
(defining “natural surface stream” to include the
 stream's “underflow”); see Underflow, A
 Dictionary of Ecology (4th ed. 2010), https://
 www.oxfordreference.com/display/10.1093/acref/9780199567669.001.0001/
 acref-9780199567669-e-5800 (last visited Sept. 9, 2024)
(defining “underflow” as “[t]he flow of
 groundwater in alluvial sediments, parallel to and beneath a
 river channel”).

[3] The Cities presented the following
 issues in their opening brief:

1. Whether the District Court for Water Division 1
(Water Court) erred in ruling C.R.S. § 37-92-305(6)(b)
(Subsection 305(6)(b)) gives the Colorado State Engineer
(State Engineer) authority to determine groundwater is
 nontributary.

2. Whether the Water Court, based on its
 interpretation and application of Subsection 305(6)(b), erred
 in ruling the burden of proof shifted from Applicant-Appellee
Lazy D Grazing Association (Lazy D) having to prove its
 nontributary claims by clear and convincing evidence to the
 Cities having to prove the groundwater at issue (Subject
 Groundwater) is tributary.

3. Whether the Water Court, based on its
 interpretation and application of Subsection 305(6)(b), erred
 in the standard it applied to the Cities' rebuttal of the
 State Engineer's Determination of Facts, dated March 31,
 2021 (State Engineer's Determination of Facts).

4. Whether the Water Court erred by speculating and
 relying on personal knowledge and information not in
 evidence.

5. Whether the Water Court determined the Subject
 Groundwater is nontributary based on faulty legal premises,
 inappropriate weight accorded to expert testimony and
 evidence, and is manifestly erroneous.

We combine these five issues into, essentially, four
 in our opinion.

[4] Specifically, the State Engineer makes
 findings in lieu of those made under section 37-90-137 in the
 context of nontributary groundwater because the
 adjudication of rights in nontributary groundwater
 doesn't imply that the applicant has an obligation to
 construct a well. E. Cherry Creek Valley Water &
 Sanitation Dist. v. Rangeview Metro. Dist., 109 P.3d
 154, 157 (Colo. 2005); see also § 37-90-137(6)
("Rights to nontributary groundwater outside of
 designated groundwater basins . . . may include a
 determination of the right to such water for existing and
 future uses." (emphasis added)). Accordingly, the
 applicant may not have the information necessary for the
 State Engineer to make the findings section 37-90-137
 requires (such as the specific proposed location of a well).
Instead, the State Engineer's findings are limited to the
 facts "of [the] application." §
 37-92-302(2)(a). The facts "of [the] application,"
 in turn, are limited to the facts "supporting the ruling
 sought." § 37-92-302(1)(a). A water court can't
 rule on an application for a determination of rights in
 nontributary groundwater if the facts of the application
 don't seek to establish that the groundwater is, indeed,
 nontributary. See § 37-92-305(11) (describing a
 water court's determination of water rights in
 nontributary groundwater). Thus, the State Engineer has the
 authority to determine those facts under subsection
 302(2)(a), and the water court is obligated to afford them a
 presumption of truth under subsection 305(6)(b).

[5] For example, the Cities protest the
 water court's citations to Encyclopedia Brittanica's
 definition of "claystone"; to a judicial guide on
 adjudicating groundwater, which provides definitions of
 various kinds of sedimentary rock; and to a report published
 by the U.S. Geological Survey comparing the sizes of various
 geological materials.

[6] These challenged references include
 scientific and legal scholarship that supports the position
 that "the rate at which a surface alluvial system
 recharges the Upper Laramie Aquifer is unaffected by
 withdrawals from the aquifer," and a governmental
 publication that supports the principle that "an
 unsaturated zone between an aquifer and an overlying stream
 system causes the aquifer to be hydraulically
 disconnected."

---------